■ WESLEY SIMCHICK, Appellant, v. I. M. YOUNG & COMPANY, Respondent.— In a breach of warranty action to recover damages for property injury, plaintiff appeals from a judgment of the Supreme Court, Suffolk County, entered March 16, 1972, in favor of defendant after a nonjury trial. Judgment reversed, on the law and the facts, with costs, and judgment granted to plaintiff against defendant in the sum of $4,836.12, with interest and costs. Plaintiff, who in the year 1963 was a farmer of 40 years' experience, owned a 90-acre farm in Cutchogue, Long Island, five acres of which he had allocated to the raising of cauliflower. Defendant is a wholesale produce dealer which employed a salesman named Zuhoski. For the period from 1957 through 1963, plaintiff used a spray product, Endrin, as an insecticide "to use for loopers and insects on [the] cauliflower." He testified that this product had been specifically recommended to him by Zuhoski. It came in five-gallon sealed cans. Instructions were contained on a label on each can. Plaintiff sowed his seed in June and July, 1963. He sprayed the field with Endrin on three occasions, the last of which was on September 10, 1963. At the end of October he harvested approximately one acre. Instead of getting the usual $2.00 to $2.50 per crate, the best he could get at the market was $1.20 because of a rumor current that a quarantine of cauliflower was imminent. He personally received a quarantine notice from the Department of Agriculture & Markets of the State of New York on or about November 1, 1963 which forbade him to "remove or dispose" of the cauliflower until permission was forthcoming from the department authorities. He complied as to the remaining four acres. Thereafter he allowed the remaining cauliflower to rot in the field and plowed it under. The quarantine was lifted on or about November 14, 1963, but since he had not tied the cauliflower — as was the practice — he had no marketable produce. The reason for the quarantine was that the cauliflower was adulterated in that it contained an illegal residue of Endrin (see Agriculture and Markets law, § 200, subd. 2). Plaintiff brought this suit on the theory of breach of implied warranty as such a warranty was then described in section 96 of the Personal Property Law. As pertinent, that section read: "1. Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose. 2. Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality." Plaintiff also relied upon the express warranty contained in the recommendation by Zuhoski. Except to admit that plaintiff had purchased insecticides from it from time to time, defendant entered a general denial. Testimony at the trial disclosed that until 1963 analyses made for Endrin residue could detect its presence to a percentage of one tenth of a part per million. A new and more sophisticated machine, the gas liquid chromacrograph (G. L. C.) could and did detect residue as low as one thousandth of a part per million in plaintiff's cauliflower. Since zero tolerance (no tolerance at all) was permitted, the produce was deemed unfit for human

consumption. Defendant disclaimed knowledge of the G. L. C. inspection machine and, in effect, based its defense upon ignorance of the new method. By its witnesses it claimed that it had acted throughout in good faith. It added that until October 15, 1963, when the Federal Government seized some Long Island cauliflower at a Baltimore market, it never knew or had reason to know of the new inspection device. It argued that, as a result, it could not be held for a breach of any warranty, express or implied. The law imposes a heavy burden on dealers in foodstuffs or on items dealing with food products, and a dealer cannot, like the ostrich, bury his head in the sand and so consider that he has insulated himself against liability. The doctrine is founded upon a principle of public policy. In *Wiedeman* v. *Keller* (171 Ill. 93, 99) the reason for the rule was stated to be: "It may be said that the rule is a harsh one; but, as a general rule, in the sale of provisions the vendor has so many more facilities for ascertaining the soundness or unsoundness of the article offered for sale than are possessed by the purchaser, that it is much safer to hold the vendor liable than it would be to compel the purchaser to assume the risk." An expert witness for defendant testified that, to his knowledge, the G. L. C. came into practice in 1962 or early 1963. Since it was used upon the produce seized in Baltimore, it had obviously been known to the governmental authorities for an appreciable period of time. Suffolk County in 1963 was not a backwater community or one cut off from the maintenance of modern farming techniques. It then ranked high as one of the largest producers of cauliflower in the State of New York. Until 1911, when the common-law principle of warranty entered the statute books (L. 1911, ch. 571, § 1, eff. Sept. 1, 1911), it was difficult to establish any culpability on the part of a retail seller for breach of an implied warranty of quality, especially if the item had been sold to the consumer in a sealed container. However, the clause in section 96 of the Personal Property Law "whether he be the grower or manufacturer or not", rendered the vendor highly vulnerable. In *Rinaldi* v. *Mohican Co.* (225 N. Y. 70) adulterated pork containing an approval-for-sale stamp of the Department of Agriculture of the United States was sold to the plaintiff. The action was for breach of implied warranty and the court noted (pp. 72–73): "Article 5 of the Personal Property Law is not merely a codification of the existing rules regarding sales in this state. It was the design as far as possible to make our law uniform with the legislation and laws on this subject existing throughout the country. To this end changes were made in what had previously been here the law. In section 96 itself, for instance, the distinction between the liability of sellers who were growers and manufacturers and others was ended. A warranty may now be established by proof of the usage of trade. Although an express warranty of quality is given, one not inconsistent with it may also be implied." By way of limitation the court added (p. 74): "We do not pass upon the question as to whether it applies to a sale in the original package bought by the vendor from others." This possible limitation was effectively removed in 1931 in *Ryan* v. *Progressive Grocery Stores* (255 N. Y. 388). There, a pin lodged in a loaf of bread injured the mouth of a customer. The loaf had been purchased as "Ward's bread". It was wrapped in a sealed package, as it came from the baker. The court, by Cardozo, Ch. J., dealt with the situation under subdivision 2 of section 96 of the Personal Property Law as follows (pp. 392–393): "Under the common-law rule long in force in this State, the warranty of merchantable quality was limited to sales by a manufacturer or grower * * *. All this has been changed since the coming of the Sales Law (Williston, *supra*). Dealer as well as manufacturer or

grower affirms as to anything he sells, if purchased by description, that it is of merchantable quality. The burden may be heavy. It is one of the hazards of the business. * * * There are times when a warranty of fitness has no relation to a warranty of merchantable quality. This is so, for example, when machinery competently wrought is still inadequate for the use to which the buyer has given notice that it is likely to be applied. There are times on the other hand when the warranties co-exist, in which event a recovery may be founded upon either. 'Fitness for a particular purpose may be merely the equivalent of merchantability' (Williston, Sales, vol. 1, § 235, and cases there cited)." The statement appears to be appropriate at bar. That plaintiff failed to tie up his crop is of no consequence. Firstly, he would have required clairvoyance to know if and when the quarantine would be lifted. Secondly, the time and effort involved in the tieing would have been futile if the quarantine were never to be lifted; and, thirdly, as noted in *Rinaldi* (*supra*), the action is one for breach of warranty in which the question of negligence plays no part (see, also, *Blessington* v. *McCrory Stores Corp.*, 305 N. Y. 140). The trial court placed the blame for plaintiff's loss on the "precipitous [*sic*] and arbitrary acts of the federal and state government agencies in quarantining his cauliflower crop." As we view it, the provisions of section 96 of the Personal Property Law, coupled with the recommendation by defendant's salesman, constitute sufficient warranty (express and implied) to impose a strict liability in tort upon this defendant. A recovery may be based on express representations (cf. *Randy Knitwear* v. *American Cyanamid Co.*, 11 N Y 2d 5) and liability cast on the party making the representation. Plaintiff's economic loss results from the use of the product for the purpose and in the manner intended (cf. *Codling* v. *Paglia*, 32 N Y 2d 330, 342). Having invited and solicited the use, defendant should not be able to avoid responsibility when the expected use leads to plaintiff's loss (cf. *Randy Knitwear* v. *American Cyanamid Co.*, *supra*, p. 12). Since the basis of the liability depends not so much on the nature of the product, but upon the representation, the duty devolves on the seller to assume the consequences when the representation proves untrustworthy, as it did here with the imposition of this quarantine because of a residue of the Endrin. "In such a context, questions of reliance come very near to the heart of the matter" (2 Harper & James, the Law of Torts, § 28.20, p. 1579). Accordingly, the burden of loss should be thrust not upon plaintiff but rather upon defendant. The Endrin was obviously not reasonably fit for use and was not of merchantable quality within the meaning of section 96 of the Personal Property Law in view of the governmentally imposed quarantine. The damages were stated fairly by plaintiff and should be allowed in the sum of $4,836.12, with interest and costs. Hopkins, Acting P. J., Cohalan and Shapiro, JJ., concur; Latham and Brennan, JJ., dissent and vote to affirm.